**FILED - GR**

November 17, 2009 3:46 PM

TRACEY CORDES, CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: __ald___/_____

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **Joseph Alexander**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) Hon. | **1:09-cv-1052** |
| v. | ) | **Gordon J Quist** |
| | ) | **U.S. District Judge** |
| **NCO Financial Systems, Inc.,** | ) | |
| a Pennsylvania corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### Complaint

**I.     Introduction**

1.      This is an action for damages brought by a consumer against a debt collector in response to the debt collector's practices which violated the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.,* and the Michigan Occupational Code ("MOC"), MCL § 339.901 *et seq*.

**II.    Jurisdiction**

2.      This Court has jurisdiction under 15 U.S.C. § 1692k(d) (FDCPA), and 28 U.S.C. § 1331. This Court has supplemental jurisdiction regarding plaintiff's state law claims under 28 U.S.C. § 1367. Venue in this judicial district is proper because the pertinent events took place here.

**III.   Parties**

3.      Plaintiff Joseph Alexander is an adult natural person residing in Osceola County, Michigan. Mr. Alexander is a "consumer" and "person" as the terms are defined and/or used in

1

the FDCPA. Mr. Alexander is a "consumer," "debtor" and "person" as the terms are defined
and/or used in the MOC.

     4.     Defendant NCO Financial Systems, Inc. ("NCO") is a Pennsylvania corporation
doing business at 507 Prudential Road, Horsham, Pennsylvania 19044. NCO is qualified to do
business in Michigan. The registered agent for NCO is The Corporation Company, 30600
Telegraph Road, Bingham Farms, Michigan 48025. NCO uses interstate commerce and the
mails in a business the principal purpose of which is the collection of debts. NCO regularly
collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or
due another. NCO is a "debt collector" as the term is defined and/or used in the FDCPA. NCO
is licensed as a collection agency by the State of Michigan to collect debts in Michigan. NCO is
a "collection agency" and a "licensee" as the terms are defined and/or used in MOC. According
to PACER, NCO has been sued more than one thousand times in the United States District
Courts for allegedly violating the FDCPA.

**IV.    Facts**

     5.     In or about March 2004, Mr. Alexander enrolled with Westwood College Online
("Westwood") (www.westwood.edu) and began to take online courses to earn a degree in
communications. Westwood's representative told Mr. Alexander that it would cost less than
$25,000.00 to obtain his degree. In order to finance Mr. Alexander's intended education, SLM
Financial Corporation ("SLM") arranged for Mr. Alexander to obtain a Carrier Training Loan,
with Sterling Bank as the creditor. Mr. Alexander had a co-signer, his mother-in-law, Anne
Holladay. Any resulting obligation to pay money in connection with the loan was a "debt" as
the term is defined and/or used in the FDCPA and MOC.

2

6.     Later in 2004, Mr. Alexander reviewed his student loan documents and discovered that the documents contained the wrong social security number and other errors. Mr. Alexander repeatedly telephoned Westwood and SLM and told them about the errors.

7.     Later in 2004, Mr. Alexander received from Westwood and/or SLM, a new set of loan documents. The documents contained various hand-written revisions and other modifications not agreed to by Mr. Alexander.

8.     In or about December 2004, Mr. Alexander repeatedly contacted Westwood in efforts to change his major from communications to criminal justice. However, Westwood failed to accommodate the request and otherwise refused Mr. Alexander's efforts to change his major. As a result, Mr. Alexander discontinued with Westwood and prepared to continue his education elsewhere.

9.     In or about January 2005, Mr. Alexander discovered that according to Westwood, Mr. Alexander already had incurred at least $25,000.00 of debt in connection with his Westwood education.

10.     Mr. Alexander repeatedly contacted Westwood and demanded an accounting. Westwood failed to provide information sufficient to justify the debt supposedly incurred by Mr. Alexander.

11.     Mr. Alexander later determined that at least $6,000.00 of the supposed debt had been disbursed by SLM and/or Sterling Bank to Westwood approximately three months *after* Mr. Alexander no longer was enrolled at Westwood. When Mr. Alexander complained to SLM, he was instructed to contact Westwood and demand that the money be returned to SLM. Mr. Alexander complained to Westwood. It is unknown whether Westwood ever returned the

3

unearned funds to SLM, or simply kept it.

12.     Mr. Alexander later learned that there were other student loans in his name of which he had no knowledge, and which had been paid to Westwood. When Mr. Alexander investigated, he was told by Westwood and/or SLM that he supposedly had applied for and received the loans online. Mr. Alexander demanded and received the related paperwork, and discovered that his signature had been forged to the documents.

13.     The statements sent by SLM to Mr. Alexander were inconsistent, contradictory, and disclosed supposed balances which differed wildly from month to month, ranging from as low as approximately $12,000.00 to as high as approximately $29,000.00.

14.     In or about early 2006, Mr. Alexander continued to demand an accounting from Westwood, but was told that the school no longer maintained a file regarding Mr. Alexander.

15.     Mr. Alexander has repeatedly and consistently disputed the debt with Westwood and with SLM.

16.     In or about 2006, Mr. Alexander refused to make another payment on the debt until Westwood and/or SLM provided an accurate accounting, provided all of his paperwork, and explained the inconsistent documents, inconsistent balances, and apparent forgeries.

17.     Westwood and/or SLM failed to provide the requested information. Instead, SLM hired various entities to try to collect the disputed debt from Mr. Alexander and his co-signer.

18.     In 2007, a supposed collection attorney hired by SLM telephoned Mr. Alexander and his co-signer repeatedly, making various false statements in efforts to collect the disputed debt.

19.     In or about 2007, Mr. Alexander's co-signer, Ms. Holladay, tired of the unlawful

4

harassment by SLM's agents, cut a deal with SLM, purportedly paid approximately $6,000.00
directly to SLM, and was relieved of further obligation to pay the supposed balance of the
disputed debt.

20.     Despite the foregoing, SLM continued to hire a series of debt collectors to collect
the disputed debt from Mr. Alexander and Ms. Holladay.

21.     By letter dated September 2, 2008, NCO wrote Mr. Alexander, stated that it had
been hired by SLM, and demanded payment of the disputed debt. The letter stated that
derogatory information regarding the debt may already have been reported to the national credit
bureaus and warned that Mr. Alexander's credit rating may be affected. The letter stated that if
Mr. Alexander notified NCO in writing within thirty days after receiving the letter that he
disputed the validity of the debt or any portion thereof, NCO would obtain verification of the
debt and mail the verification to Mr. Alexander.

22.     In September 2008, Mr. Alexander spoke by telephone with an unidentified
female NCO employee. In the ensuing conversation, the NCO employee made the following
false and improper statements:

a)      She was looking right then at Mr. Alexander's credit report, derogatory
        information regarding the debt had been on Mr. Alexander's credit report since
        2006, and that if Mr. Alexander did not pay the debt, derogatory information
        would remain on Mr. Alexander's credit report forever.

b)      Even if Mr. Alexander were to send NCO a letter stating that he refused to pay the
        alleged debt, NCO would not cease calling and writing Mr. Alexander and instead
        would continue its collection efforts.

5

The NCO employee then transferred Mr. Alexander to a NCO "Supervisor." In the ensuing conversation, the NCO Supervisor made the following false and improper statements:

c)   "At this point, you are saying you are refusing to pay on the account. I am going to proceed with litigation against you. You will be hearing from our attorneys."

d)   An attorney fee of $3,350.00 was going to be added to the debt, calculated as twenty percent of the sum of the alleged balance and an already added twenty percent collection fee.

e)   Without Ms. Alexander appearing in court, NCO was going to garnish twenty-five of Mr. Alexander's income and twenty-five percent of the income of Mr. Alexander's co-signer.

f)   If Mr. Alexander or his co-signer have any property, the property is going to be seized.

23.   On September 23, 2008, Mr. Alexander through his attorney filed a lawsuit against NCO in the United States District Court for the Western District of Michigan, Case No. 1:08-cv-892, alleging violations of the FDCPA and MOC.

24.   The Complaint filed by Mr. Alexander in Case No. 1:08-cv-892 expressly stated that Mr. Alexander disputed the debt.

25.   The Complaint filed by Mr. Alexander in Case No. 1:08-cv-892 expressly stated that Mr. Alexander refused to pay the debt.

26.   In September 2008, NCO was served with a copy of the Complaint in Case No. 1:08-cv-892.

27.   On December 11, 2008, the parties filed a stipulation to dismiss Case No. 1:08-

6

cv-892 with prejudice.

28.     By letter dated October 6, 2009, NCO again wrote directly to Mr. Alexander and demanded payment of the debt.

29.     The FDCPA states that if the consumer notifies the debt collector in writing within the thirty-day period described in 15 U.S.C. § 1692g(a) that the debt, or any portion thereof, is disputed, the debt collector shall cease collection of the debt, or any portion thereof, until the debt collector obtains verification of the debt and a copy of such verification is mailed to the consumer by the debt collector. 15 U.S.C. § 1692g(b).

30.     In September 2008, NCO was served with the Complaint in Case No. 1:08-cv-892, which expressly stated that Mr. Alexander disputed the debt.

31.     NCO has never mailed Mr. Alexander verification of the debt.

32.     NCO violated the FDCPA because after NCO received Mr. Alexander's timely written dispute of the debt, NCO did not mail verification of the debt to Mr. Alexander and instead continued its efforts to collect the debt from Mr. Alexander.

33.     The FDCPA states that if a consumer notifies the debt collector in writing that the consumer refuses to pay a debt, the debt collector shall not communicate further with the consumer with respect to the debt. 15 U.S.C. § 1692c(c).

34.     In September 2008, NCO was served with the Complaint in Case No. 1:08-cv-892, which expressly stated that Mr. Alexander refused to pay the debt.

35.     NCO violated the FDCPA because after NCO was notified in writing that Mr. Alexander refused to pay the debt, NCO communicated further with Mr. Alexander with respect to the debt.

7

36.     The FDCPA states that a debt collector may not communicate with a consumer in connection with the collection of a debt if the debt collector knows the consumer is represented by an attorney with respect to the debt and has knowledge of, or can readily ascertain, the attorney's name and address.  15 U.S.C. § 1692c(a).

37.     In September 2008, NCO was served with the Complaint in Case No. 1:08-cv-892, putting NCO on notice that Mr. Alexander was and is represented by an attorney with respect to the debt.

38.     NCO violated the FDCPA by communicating with Mr. Alexander after NCO became aware that Mr. Alexander was represented by an attorney with respect to the debt and had knowledge of the attorney's name and address.

39.     In or about October 2009, NCO repeatedly telephoned Mr. Alexander at his residence in efforts to collect the debt.

40.     On or about October 26, 2009, Mr. Alexander spoke by telephone with a male NCO employee regarding the debt.  In the ensuing conversation, the NCO employee made the following statements:

a)     Mr. Alexander should hire an attorney and sue Westwood.

b)     If Mr. Alexander continued to dispute and refuse to pay the debt, the debt was going to continue to grow like crazy.

c)     The debt was being reported on Mr. Alexander's credit as an "I-9" which was causing more harm than if Mr. Alexander had filed for bankruptcy.

d)     Derogatory information regarding the debt would remain on Mr. Alexander's credit reports indefinitely and until the debt is paid, and would never go away.

8

e)    What does your attorney say about the debt?

f)    NCO had telephoned Mr. Alexander at least nine times that month.

g)    Mr. Alexander could not dispute the debt with NCO, and instead was required to telephone Sallie Mae to dispute the debt.

Mr. Alexander continued to state that he disputed the debt and refused to pay the debt. Mr. Alexander stated that he intended to send a letter to NCO stating that he disputed the debt and refused to pay the debt. Mr. Alexander asked for the NCO address to send the letter. Hearing that, the NCO immediately transferred the telephone call to his "Supervisor" named Ron Anderson. Mr. Anderson stated that Mr. Alexander could send the letter but that NCO would not stop collection activity on the account.

41.    NCO's employee made false representations regarding the effect the unpaid debt was having on Mr. Alexander's credit history and credit score.

42.    NCO's employee made false representations regarding the length of time for which the debt if unpaid would remain on Mr. Alexander's credit report.

43.    NCO and its employees continued to communicate directly with Mr. Alexander regarding the debt, even though the NCO employee acknowledged that he and NCO was aware that Mr. Alexander was represented by an attorney with respect to the debt.

44.    NCO's employee wrongfully stated that Mr. Alexander could not dispute the debt with NCO and instead was required to telephone Sallie Mae to dispute the debt.

45.    The NCO Supervisor wrongfully threatened that even if Mr. Alexander sent a letter to NCO stating that he disputed and refused to pay the debt, NCO would continue its efforts to collect the debt from Mr. Alexander.

9

46.     In November 2009, NCO continued to place telephone calls to Mr. Alexander in efforts to collect the disputed debt.

47.     In November 2009, NCO continued to communicate in writing with Mr. Alexander in efforts to collect the disputed debt.

48.     The acts and omissions of NCO and its employees were done willfully.

49.     NCO and its employees willfully violated the FDCPA and MOC.

50.     The repeated, unrelenting and unlawful efforts by NCO and its employees to collect the debt from Mr. Alexander caused Mr. Alexander to suffer, among other things, loss of sleep, embarrassment, depression, frustration, extreme stress, and discord and strain in his marriage.

51.     As an actual and proximate result of defendant's acts and omissions, plaintiff has suffered actual damages and injury, for which he should be compensated in an amount to be established by jury and at trial.

**V.     Claims for Relief**

**Count 1– Fair Debt Collection Practices Act**

52.     Plaintiff incorporates the foregoing paragraphs by reference.

53.     Defendant has violated the FDCPA. Defendant's violations of the FDCPA include, but are not necessarily limited to, the following:

a)      Defendant violated 15 U.S.C. § 1692c(a) and (c);

b)      Defendant violated 15 U.S.C. § 1692d by engaging in conduct the natural consequence of which was to harass, oppress and abuse plaintiff in connection with the collection of a debt;

10

c)   Defendant violated 15 U.S.C. § 1692e by using false, deceptive and misleading representations and means in connection with the collection or attempted collection of a debt;

d)   Defendant violated 15 U.S.C. § 1692f by using unfair and unconscionable means to collect or attempt to collect a debt; and

e)   Defendant violated 15 U.S.C. § 1692g.

**Wherefore,** plaintiff seeks judgment against defendant for:

a)   Actual damages pursuant to 15 U.S.C. § 1692k(a)(1);

b)   Statutory damages pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c)   Costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3); and

d)   Such further relief as the court deems just and proper.

### Count 2 – Michigan Occupational Code

54.   Plaintiff incorporates the foregoing paragraphs by reference.

55.   Defendant has violated the MOC.  Defendant's violations include, but are not necessarily limited to, the following:

a)   Defendant violated M.C.L. § 339.915(e) by making an inaccurate, misleading, untrue, or deceptive statement or claim in a communication to collect a debt;

b)   Defendant violated M.C.L. § 339.915(f) by misrepresenting in a communication with a debtor the following: (i) the legal status of a legal action being taken or threatened, and (ii) the legal rights of a creditor or debtor;

c)   Defendant violated M.C.L. § 339.915(n) by using a harassing, oppressive, or abusive method to collect a debt; and

11

d)   Defendant violated M.C.L. § 339.915(q) by failing to implement a procedure

designed to prevent a violation by an employee.

**Wherefore,** plaintiff seeks judgment against defendant for:

a)   Actual damages pursuant to M.C.L. § 339.916(2);

b)   Treble the actual damages pursuant to M.C.L. § 339.916(2);

c)   Statutory damages pursuant to M.C.L. § 339.916(2); and

d)   Reasonable attorney's fees and court costs pursuant to M.C.L. § 339.916(2).

### Demand for Trial by Jury

Plaintiff demands trial by jury.

Dated: November 17, 2009

Phillip C. Rogers (P34356)
Attorney for Plaintiff
40 Pearl Street, N.W., Suite 336
Grand Rapids, Michigan 49503-3026
(616) 776-1176
ConsumerLawyer@aol.com

12